KATHLEEN M. O’MALLEY, Circuit Judge,
dissenting in part.
I agree with most of the findings in the thorough and thoughtful majority opinion. Specifically, I agree that the Carmack Amendment does not apply to the road or rail leg of an intermodal overseas export shipped under a single through bill of lading. I also agree that CNA cannot maintain actions in bailment or negligence against the carriers, and that its cause of action is limited to a claim for breach of the Service Contract. Finally, I agree that CNA’s breach of contract action is available only against Hyundai, not the rail carrier defendants. And, I agree that Hyundai is liable, by contract, for the subcontractor’s conduct. It is the next conclusion — the one set forth in section III.B. of the majority opinion — with which I cannot agree.
I do not believe that Hyundai’s contractual liability to Corning (and, hence to CNA) “must be resolved under Carmack” as the majority holds. Instead, because Hyundai was authorized as Coming’s agent to limit the subcontractor’s liability, and did so by and on behalf of Corning, I believe Hyundai’s liability is limited to that same extent. Because I believe the majority misreads Form Bill of Lading § 5(B)(2) and improperly construes the extent of Hyundai’s liability, I respectfully dissent from the majority’s conclusion that Hyundai is liable to CNA to the full extent of the liability specified in the Carmack Amendment.
Form Bill of Lading § 5(B)(2) states that, “with respect to ... damage caused during the handling, storage, or carriage of the Goods by [Hyundaij’s Subcontractor, such liability shall be to the extent to which such Subcontractor would have been liable to [Corning] if it had made a direct and separate contract with [Corning] in respect of such handling, storage, or carriage.” [1] Based on this provision, the majority finds Hyundai liable to CNA to the extent of liability imposed by the Carmack Amendment. The majority finds that, if the rail carriers had separately and directly contracted with Corning, those contracts would have been subject to the Carmack Amendment because the subcontractors are domestic rail carriers. Maj. Op. at 374-75. As such, the majority concludes that these rail carriers would have been unable to limit their liability by contract in the absence of an express waiver by Corning, and that Hyundai also may not limit its pass-through liability. Id. The majority reaches this conclusion based on the prop *377 osition that “a rail carrier may avoid Car-mack liability for container carriage if it offers Carmack coverage to the shipper and the shipper declines.” Id. at 874-75 n. 46 (citation omitted). Because it finds that “Hyundai stands in the shoes of the rail carrier here,” the majority concludes that Hyundai cannot avoid Carmack liability on this basis because “Hyundai did not offer [Corning] any Carmack coverage option.” Id. What the majority fails to recognize, however, is that the rail carriers did offer Carmack coverage to Corning, through its agent, and that Corning affirmatively waived that coverage. While Hyundai must fulfill the carrier’s obligations to Corning, it actually stood in Coming’s shoes for purposes of defining the scope of that liability.
The Service Contract states that “[p]arties agree to allow [Hyundai] to contract or establish agency as may be necessary to provide inland transportation or door to door services in international commerce if called for in the rates spelled out in Appendix C.” Service Contract, RE:78-6, Page ID # 496 at ¶ 2(A) (emphasis added). Then, section 4(B) of the Form Bill of Lading provides Hyundai with the authority to “subcontract on any terms the whole or any part of the handling, storage[,] or carriage of the Goods and any duties undertaken by [Hyundai] in relation to the Goods.” (emphasis added). Further, Form Bill of Lading § 5(A) states that “[Hyundai], in making arrangements for transportation ... or handling before loading or after discharge acts only as [Coming’s] agent and assumes no responsibility therefor.” These provisions, taken together, allowed Hyundai to establish agency for purposes of entering into agreements with other carriers on any terms. And Hyundai, acting as Coming’s agent as outlined in section 5(A), proceeded to subcontract the rail portions of the shipment. Hyundai, fully within its authority, then refused full Carmack liability from the subcontractors, and, accordingly, limited the liability of the subcontractors. Consequently, the analysis should end here, as we know the amount of liability Corning set for the subcontractors through its agent, Hyundai. Although Hyundai is ultimately accountable for that liability, it was also authorized to limit its terms.
While the majority points out that Hyundai is defined at places in the Service Contract as an independent contractor, nothing precluded Hyundai from acting as both an independent contractor and an agent, depending upon the activity in question. “[N]othing about the title independent contractor invariably precludes someone from being an agent under appropriate circumstances.” United States v. Hudson, 491 F.3d 590, 595 (6th Cir.2007) (citing Restatement (Second) of Agency § 2(3) (“An independent contractor ... may or may not be an agent.”)); Eyerman v. Mary Kay Cosmetics, Inc., 967 F.2d 213, 219 (6th Cir.1992) (noting that “a person may be both an independent contractor and an agent”). Thus, the fact that Hyundai acted as an independent contractor who could not bind the carriers to a direct contract with Corning — pursuant to its express authorization to do so in both the Service Contract and the Form Bill of Lading — does not conflict with Hyundai’s ability to act as the agent of Corning for purposes of limiting the scope of the carriers’ liability. Hyundai can and did properly limit the subcontractor’s liability on behalf of Corning.[2]
*378 In this regard, I specifically disagree with the majority’s conclusion that Form Bill of Lading § 5(B)(2) placed Hyundai in the “shoes” of the rail carriers. Section 5(B)(2) states that Hyundai’s “liability shall be to the extent to which the Subcontractor would have been liable to [Corning] if it had made a direct and separate contract with [Corning] in respect of such handling, storage, or carriage.” (emphases added). This provision does not actually place Hyundai in the subcontractor’s shoes, it only holds Hyundai liable to the extent the subcontractor would have been liable to Corning under such circumstances. As such, the hypothetical analysis called for under § 5(B)(2) should not consider whether Hyundai itself offered Corning any Carmack coverage option; it should look to what the subcontractor offered to Corning through its agent. It appears, moreover, that the purpose of this provision was to assist Hyundai in segmenting liability among the subcontractors in circumstances where the parties could assess the damage to the goods against a particular subcontractor; the majority reads far too much into it.
For these reasons, I believe that Hyundai is contractually liable to CNA to the extent, and only to the extent, acting on behalf of Corning, it held the carriers liable: to the tune of $10,000.00, and no more. See BNSF Rules, RE: 79-12 at Item 64, Page ID # 769; NS Rules, RE: 78-14 at Item 8.6.2, Page ID #591. I note, moreover, that, even if we were to assume that Hyundai did not act as Coming’s agent when limiting the carriers’ liability, we could not, as the majority does, assume that Corning would not have waived Carmack liability if it had contracted directly with the rail carriers. I believe that we would need to remand for a determination of the amount of liability Corning would have contracted for with the subcontractors based upon a consideration of all relevant evidence. On this point, the agreement between Coming and Hyundai is highly relevant. Of particular note, Corning did not request full liability under COGSA by declaring the full value, despite having the option of receiving a greater scope of liability in return for payment of a higher fee. Instead, Corning purchased additional insurance through CNA to cover this difference in liability coverage, opting to pay lower freight costs. Thus, it seems likely Corning would have taken the same approach in a direct and separate contract with the subcontractors vis-a-vis its option for Carmack liability, with its attendant higher cost, by declining full Carmack liability.
For the foregoing reasons, I respectfully dissent from the majority’s finding that Hyundai is liable to CNA under the Car-mack Amendment; I would limit Hyundai’s liability to $10,000.

. The Service Contract incorporates Hyundai's Form Bill of Lading.

. While it may seem odd that Corning would give Hyundai the authority to limit its own liability by limiting that of the carriers, that is precisely the arrangement Corning chose. Notably, this is consistent with Coming’s overall choices — waiving liability in return for *378 lower shipping charges and choosing, instead, to buy insurance from CNA to cover any damages to the goods transported.